Don L. HENDERSON,

James E. Nickels, Appellant,

Ella D. Peterson,

v.

Gail HUECKER, Director of the Arkansas Department of Social and Rehabilitative Services; E. Russell Baxter, Commissioner of Rehabilitation Services; R. Lewis Urton, Former Deputy Commissioner of Rehabilitation Services; Vincent H. Bond, Deputy Commissioner of Rehabilitation Services; Ray Eugene Harwood, Administrator, Hot Springs Rehabilitation Center; Richard W. Kuhn, Program Development Services Supervisor, Individually and as agents of the Arkansas Department of Social and Rehabilitative Services—Walter "Buddy" Carmack, Assistant Administrator for Medical Services, Appellees.

Don L. HENDERSON and James E. Nickels,

Ella D. Peterson, Appellant,

v.

Gail HUECKER, Director of the Arkansas Department of Social and Rehabilitative Services; E. Russell Baxter, Commissioner of Rehabilitation Services; R. Lewis Urton, Former Deputy Commissioner of Rehabilitation Services; Vincent H. Bond, Deputy Commissioner of Rehabilitation Services; Ray Eugene Harwood, Administrator, Hot Springs Rehabilitation Center; Richard W. Kuhn, Program Development Services Supervisor, Individually and as agents of the Arkansas Department of Social and Rehabilitative Services—Walter "Buddy" Carmack, Assistant Administrator for Medical Services, Appellees.

Nos. 83–2049, 83–2050.

United States Court of Appeals, Eighth Circuit.

Submitted March 26, 1984.

Decided Sept. 27, 1984.

Walker, P.A., John W. Walker, Little Rock, Ark., for appellant.

Steve Clark, Atty. Gen., Mary B. Stallcup, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

McMILLIAN, Circuit Judge.

James E. Nickels and Ella Peterson appeal from a final judgment entered in the District Court for the Western District of Arkansas after a non-jury trial in favor of state rehabilitation services directors, administrators, and supervisors finding that Nickels and Peterson failed to demonstrate that they had been deprived of their first amendment rights of free speech and association. For reversal Peterson argues that the district court erred in finding that her conduct was not constitutionally protected. Nickels and Peterson argue that the district court erred in finding that even if their conduct were constitutionally protected, their employment positions were adversely affected because of poor job performance and that the protected conduct was not a motivating factor in appellees' employment decisions. For the reasons discussed below, we affirm in appeal No. 83–2050 and reverse in appeal No. 83–2049.

Nickels and Peterson were public employees at the Hot Springs Rehabilitation Center (HSRC), a state-administered federally-funded vocational rehabilitation facility for severely or multiple handicapped persons. Qualified staff members work closely with their students providing medical, psychological, and vocational services with the goal of returning them to the work force.

*Peterson*

Peterson was employed as a counselor at HSRC since July 1970. Between 1970 and 1975, she received several promotions and salary increases because of positive job performance appraisals. In 1975, Peterson was upgraded to the position of Rehabilita-

Pamela D. Walker, Little Rock, Ark., Benita Terry Jones, Dallas, Tex., John W.

tion Services Supervisor I. Her responsibilities included coordinating medical services for severely disabled students and determining the proper funding sources to be used to pay for expenditures of a particular student. In 1976 and 1977, although Peterson's performance appraisals stated that her performance exceeded the job requirements, it was also noted that she needed to improve her coordination and cooperation with other staff members and improve the accuracy of her case management records and reports.

In June 1977, Peterson's immediate supervisor, Delter Wiseman, notified his employees that a statewide Spinal Cord Project would be transferred to HSRC. Buddy Carmack, Director of the Spinal Cord Project, was chosen to be the head of a new Student Services Section at HSRC. In his new position Carmack would be Peterson's supervisor.

Peterson contacted Wiseman, protesting HSRC's failure to advertise the job as required by state policy. Peterson felt that she was qualified to be in charge of the new student services section. Dissatisfied with Wiseman's explanation for the failure to advertise the position,[1] Peterson registered a complaint with the state attorney general's office. Consequently, the position was advertised, a screening committee assembled and Peterson was among the applicants considered for the job. However, Carmack was rated first by the screening committee and ultimately chosen for the position.

In 1979 and 1980, Carmack distributed job audit questionnaires to staff members in the Student Services Section. Peterson resisted filling out the forms, claiming that she feared her position would be downgraded in retaliation for her earlier protests. Despite performance appraisals in 1978 and 1979 noting cooperation difficulties with other staff members, inaccuracies in her case management records and reports, and a need to improve her overall attitude, her

position was not downgraded and she received several salary increases.

In 1979 and 1980, Peterson wrote several letters to persons in positions of authority concerning the quality of services provided at HSRC. Peterson also expressed these concerns in a letter to the then United States Department of Health, Education and Welfare (HEW). She received a response on April 18, 1980, stating that someone from the HEW regional office in Dallas would contact the state Commissioner of Rehabilitative Services, E. Russell Baxter, about her letter.

On May 29, 1980, Peterson received a memorandum stating that she was being placed on probation for three months because of poor job performance. Attached to the probation notice were copies of performance appraisals and several excerpts from her case management reports purportedly demonstrating poor job performance.

On June 12, 1980, Peterson commenced this action, filing a complaint and attaching as exhibits the probationary evidence prepared by HSRC. After service of the complaint to HSRC, Peterson was terminated for publicly releasing confidential student information in violation of HSRC's strict confidentiality policy and for poor job performance. Peterson objected to her probation and termination and asked that her employment record be restored to reflect her original good standing and sought monetary relief for loss of employment and injury to her professional standing. The district court found that there was no protected conduct and that the probation and termination were justified, denying all requested relief.

■ The state cannot condition employment in a manner that infringes upon the employee's constitutionally protected interest in freedom of expression and association. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983)

---

1. Peterson initially contacted her immediate supervisor, Delter Wiseman, and was told that

Buddy Carmack was best qualified for the job.

(citations omitted). The state, as an employer, has an interest in providing efficient public service. A careful balance must be struck between that interest and the interest of the employee in exercising the freedoms guaranteed by the first and fourteenth amendments. *See Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

■ To succeed on claims that employees' first and fourteenth amendments rights have been abridged, employees must demonstrate that their conduct was protected by the first and fourteenth amendments and that the protected conduct was a "substantial" or "motivating" factor in the employer's action. *Derrickson v. Board of Education*, 703 F.2d 309, 316 (8th Cir.1983) (footnotes omitted), *citing Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). If the employee can successfully show the above, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that they would have taken the same action even in the absence of the protected conduct. 703 F.2d at 316.

■ Peterson argues that the district court erred in finding that her conduct was not constitutionally protected. Peterson claims that the district court only considered whether her expression of dissatisfaction with HSRC's failure to advertise a position was protected conduct and improperly disregarded the series of meetings and communications with several influential persons such as the governor of Arkansas,[2] Gail Huecker, Arkansas Director of Social and Rehabilitative Services,[3] and Robert R. Humphreys, a member of HEW's Rehabilitation Services Administration Committee.[4]

That the meetings took place and the letters were written is not disputed; nevertheless these communications were disregarded by the district court in its disposition of Peterson's claims: "The *alleged protected speech of ... Peterson* which concerns the court ... [is] the *complaint Peterson made in 1977* .... If there was protected speech which caused [Peterson's] dismissal, it involved these ... incidents and no others." *Henderson v. Huecker*, No. 80–6020, slip op. at 15 (W.D.Ark. June 30, 1983) (emphasis in original).

The district court did not address whether Peterson's communications regarding the services provided the severely handicapped were protected conduct or whether her criticisms were a substantial or motivating factor in her eventual termination.

---

2. In response to a letter written to him from Peterson, Governor Bill Clinton arranged a meeting between Peterson, Brady Anderson, then Director of Social and Rehabilitative Services, and himself to discuss the lack of services for the severely disabled at HSRC.

3. In January 1980, Peterson met with the Arkansas Director of Social and Rehabilitative Services, Gail Huecker, to discuss improvements in services for the severely disabled at HSRC.

4. On April 4, 1980, Peterson wrote the following letter:

> Mr. Robert R. Humphreys
> Rehabilitation Services Administration Committee
> 330 C Street, HEW, South Building, Room 3006
> Washington, D.C. 20201
> Dear Sir:
> For sometime now I have been concerned about the type of disabilities students have who enroll here, Hot Springs Rehabilitation Center. The lack of staff to meet their needs which are related primarily to mental retardation (above educable level), emotional disturbances, and physical handicaps is appalling. Having worked here since 1971 and in the Medical Department since 1973, I have grown aware of students' needs. Then, I have been harrassed when I attempted to get even meager consideration for "my severely disabled". I have been absolutely misunderstood.
> Our student census is down (334 on 3/31/80). It should be at least 425.
> Some of the staff are vitally concerned about the situation and have tried through the Director of Human Services in Little Rock to get help. We started in November 1979 and as of this date we have received no help.
> Is it possible for you to direct someone to investigate. The Supervisor most likely to give you a clear, concise picture is Ron Jones. In behalf of the severely disabled and tax payers, I thank you.
> > Sincerely,
> > Ella D. Peterson
> > Medical Coordinator

The district court concluded only that Peterson failed to demonstrate that her complaints about HSRC's failure to advertise a job opening, even if protected conduct, were substantial or motivating factors in her termination. Instead the court found that Peterson was dismissed because she violated HSRC and state regulations on the confidentiality and disclosure of student information and for inadequate job performance. *Id.* at 22.

Ordinarily it would be necessary to remand for further findings by the district court to determine whether Peterson's communications regarding the quality of services offered at HSRC are protected conduct. Upon careful examination of the record, we can say that even assuming the conduct is protected, Peterson would have been terminated absent such conduct. Peterson was unquestionably dedicated to improving the plight of the severely handicapped at HSRC. However, the record reflects that as early as May 1976, Peterson was responsible for sizeable financial errors in allocating expenditures for students. It was also noted that Peterson needed to improve the accuracy of her case management records and reports and improve her relationship with co-workers. These criticisms continued and Peterson's overall performance rating steadily declined. Finally in May 1980, Peterson was placed on probation; her performance evaluation cited eighteen examples of unacceptable case management and listed case management financial errors in excess of $30,-000.

Peterson's attitude and performance failed to improve during her probationary period. A September 1980 performance evaluation report contains several examples of Peterson's failure to follow established procedures and misexpenditure of funds. Peterson's case management records and reports continued to be inaccurate and unclear unless rewritten after review by her supervisor.

Finally, upon filing the present lawsuit, Peterson attached as exhibits to the complaint confidential student information in violation of state and federal policies on confidentiality.[5] At trial Peterson admitted that she was familiar with these policies regarding confidentiality of student records and that she knew that these documents contained confidential material. She also acknowledged that confidentiality could have been maintained by simply deleting the names of the students, yet she deliberately chose not to do so. Peterson's decision not to respect the students' privilege of confidentiality disclosed to the public sensitive and personal information. On September 11, 1980, Peterson was terminated purportedly because of continued poor job performance during her probationary period and gross misconduct in releasing confidential student material. Assuming without deciding that Peterson's communications are protected conduct, we hold as a matter of law that the record demonstrates by a preponderance of the evidence that Peterson was dismissed because of poor job performance and a breach of confidentiality and not because of the alleged incidents of protected conduct.

*Nickels*

Nickels began working at HSRC in 1972. Nickels was a trained staff member who evaluated the vocational potential of the handicapped students at HSRC.

While employed at HSRC, Nickels was an active member of the American Federation of State, County and Municipal Employees and was eventually elected president of the local union. Although the union was not recognized as an official bargaining agent for the employees at HSRC, Nickels, as union president, often presented employee grievances to HSRC management.

Nickels voluntarily resigned from his employment at HSRC in August 1977. Pursuant to HSRC policy, Nickels' immediate supervisor David Stone and HSRC administrator Ray Eugene Harwood completed

---

**5.** Peterson attached not only those examples contained in her probationary documents but other confidential student information that she believed was pertinent to her case.

exit recommendations and placed them in Nickels' personnel file. Although Stone recommended reemployment, he wrote "I would qualify my 'yes' for re-employment only under certain restricted conditions due to his negative feelings regarding management and his tendency to operate in informal group activities which I feel were detrimental to the overall Center operation." Harwood recommended against reemployment stating:

> It is my opinion that Mr. Nickels resents and does not respond in a positive manner to supervision and/or authority. He is *not* a team type person or employee. He has at times taken exception to Division, Agency, and Center Policies and Procedures and has, in my opinion, at times encouraged poor attitude, morale, and staff relationships. To his credit, he has involved himself in a very positive manner in certain community affairs for the benefit of handicapped individuals especially regarding the removal of architectural barriers in the Hot Springs Community. His efforts in this area have been significant and are recognized. The file reveals that Mr. Nickels does have a satisfactory knowledge of the Vocational Evaluation process, interest in individual students and their program. Therefore, any recommendation of employment/re-employment in the positive sense would have to be made after weighing the total job knowledge and performance as opposed to the possible negative influence this individual might have on other employees.

> In my opinion, Mr. Nickels has used many situations to harass and intimidate his supervisor(s) and use "half truths", information taken out of "context", and poor information in an effort to discredit

the Division, Agency and Center Administration.

Nickels took exception to these memoranda and sought to have them expunged from his personnel file. In addition, Nickels sought compensatory relief for the deprivation of professional standing. The district court dismissed Nickels' complaint, finding that the evaluations were not related to the exercise of his first amendment rights.

Nickels argues that the district court erred in finding that there is "ample evidence to establish that the evaluations were based on an honest assessment of Nickels' [job] performance" and were in "no way related to his exercise of First Amendment rights." *Henderson v. Huecker*, slip op. at 7.[6] Appellees correctly note that this court is bound by the district court's factual findings unless the findings are clearly erroneous. "A finding is clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *St. Louis Typographical Union No. 8 v. Herald Co.*, 402 F.2d 553, 557 (8th Cir.1968) (citations omitted). We have carefully examined the entire record in the present case and we are convinced that a mistake has been made by the district court.

 Union membership is protected by the right of association guaranteed by the first and fourteenth amendments. *See Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *American Federation of State, County, & Municipal Employees v. Woodward*, 406 F.2d 137, 139 (8th Cir.1969). "The right ... to discuss, and inform people concerning the advantages and disadvantages of unions and join-

---

**6.** Nickels correctly notes that the district court made several findings which are, on their face, clearly erroneous. Although these errors are of minor importance, we address them here. The district court stated that Nickels commenced his employment at HSRC in 1975, but it is undisputed that Nickels had been working there since 1972. The district court states that Buddy Carmack testified that Nickels had a disruptive influence on the staff. Careful review of Car-

mack's testimony reveals that he made no such statement. The district court improperly found that Nickels discussed HSRC policy at *student* staffings—meetings called by counselors for the purpose of discussing a particular student. It is undisputed that Nickels only addressed these issues at *staff* meetings, the purpose of which was to share information among the staff and discuss changes in HSRC policy.

ing them is protected not only as part of free speech, but as part of free assembly." *Thomas v. Collins,* 323 U.S. at 532, 65 S.Ct. at 324. It is well settled that this constitutional protection does extend to public employees. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 605, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967); *Wieman v. Updegraff,* 344 U.S. 183, 191–92, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952).

■ Appellees do not dispute that Nickels' conduct is protected by the first and fourteenth amendments, but argue that the district court's conclusion is amply supported by the record. After careful examination of the record, particularly of Stone's and Harwood's testimony at trial, we hold that the district court's finding that appellees demonstrated that the exit recommendations were not motivated by anti-union animus is clearly erroneous.

Certainly both adverse recommendations are suspect on their face. Stone's comments refer to Nickels "negative feelings regarding management and his tendency to operate in *informal group activities.*" (Emphasis added.) Harwood makes similar references to Nickels' challenges of HSRC's policies and occasional resistance to management. Both Stone and Harwood testified that they were aware of Nickels' union affiliation and activities.[7] Nickels often brought employee grievances to the attention of Harwood although Harwood refused to discuss these grievances with Nickels because the union was not recognized at HSRC. Further, Harwood admitted that he did not appreciate Nickels talking to other employees about their grievances.

At trial Harwood and Stone were asked to cite specific examples of Nickels' poor job performance. Both stated that Nickels "debated" HSRC policy and procedures at several staff meetings. However, Har-

wood admitted that the purpose of staff meeting was to share information *and* discuss management directives. Harwood objected to Nickels' public discussion of his disagreements and stated that he would have preferred that Nickels discuss his concerns privately with him or Stone. There is no claim, however, that Nickels' open discussion at staff meetings violated chain of command policies at HSRC, nor is there corroborative evidence that these discussions were in any way disruptive. In addition, the staff meeting disturbances were never documented nor was Nickels ever confronted concerning his behavior at staff meetings.

Stone complained that Nickels sometimes left his work station to talk to other employees, but Stone could not state with certainty that these visits were not work-related or necessary to the team effort required for satisfactory vocational evaluations. Likewise, these excursions away from Nickels' work station were neither documented nor discussed with him. Appellees failed to present a single example of poor job performance that was not related to Nickels' union activities. There is no indication that Nickels failed to submit the proper reports, keep accurate records, meet the needs of his clients, or otherwise perform duties required of him. *Compare Wentz v. Klecker,* 721 F.2d 244, 247 (8th Cir.1983).

Appellees readily admit that Nickels was a good vocational evaluator and had never been denied a merit raise. Appellees also acknowledge that Nickels was active in community efforts to help handicapped and disabled persons and played a significant role in the removal of architectural barriers to handicapped persons in Hot Springs. It is notable that Nickels' "disruptive" behavior is not documented in his annual job performance evaluations nor was Nickels ever directly told that his job performance was in any way less than satisfactory. We

7. Although appellees asserted that they harbored no anti-union animus, shortly after the union helped to secure better retirement options for the HSRC employees, Harwood circulated a memorandum on the subject of Management-Labor Relations that we view as an effort by management to discourage union activities at HSRC.

hold, therefore, that the district court's finding that Nickels' adverse exit recommendations were not based on Nickels' union activities but instead upon a fair evaluation of his job performance is clearly erroneous.

Accordingly, the judgment of the district court is affirmed in part and reversed in part. We instruct the district court to order HSRC to expunge the adverse exit recommendations from Nickels' personnel record, and because it is HSRC policy to complete exit recommendations for every employee who leaves its employment, HSRC's new exit recommendations for Nickels shall accurately reflect his performance as a vocational evaluator without any consideration of his union activities. Nickels has not demonstrated that he has been injured because of the adverse exit recommendations, and is therefore not entitled to compensatory relief.

HENLEY, Senior Circuit Judge, concurring in part and dissenting in part.

I respectfully disagree with so much of this court's action as reverses the judgment of the district court. I have no quarrel with the majority's holding that the adverse exit recommendations with respect to Nickels must be expunged if they were motivated by anti-union animus. However, I cannot agree with the conclusion that the district court's finding with respect to Nickels are clearly erroneous. In my opinion, the majority speculates when it infers from the cold record that the exit recommendations were based on Nickels' union activities. I believe this was an inference which the district court certainly could have drawn, but was not one which it was required to draw.

Nickels may well have had a disruptive influence at HSRC which was separate and apart from his union activities. Nickels himself testified that he was a part of a "team effort" at HSRC and that trust and respect between staff members were essential to the success of the program. The district court found that Nickels' argumentative attitude at staff meetings caused the

meetings to become tense and uncomfortable. The court properly could have found that it was not Nickels' union activities per se which motivated the exit recommendations but was instead the disrespectful and resentful *manner* in which he pursued his concerns. In short, I am not left with a definite and firm conviction that the district court made a mistake in concluding as it did. I would affirm as to Nickels as well as to Peterson.