ROSANNE M. FORREST COX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cox v. Commissioner
Docket No. 28394-90
United States Tax Court
T.C. Memo 1993-559; 1993 Tax Ct. Memo LEXIS 575; 66 T.C.M. (CCH) 1430; November 29, 1993, Filed *575 Decision will be entered under Rule 155. Rosanne M. Forrest Cox, pro se. For respondent: Nancy Graml. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency in and additions to petitioner's 1985 Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6654
Sec. 6661
1985
$ 98,594
$ 49,297
50% of the
$ 5,650
$ 24,648
interest due on
the deficiency
In the answer to the amended petition, respondent asks that, in the alternative to the additions to tax for fraud under section 6653(b)(1) and (2), we hold petitioner liable for additions to tax for failure to file her 1985 income tax return and negligent or intentional disregard of the rules and regulations under sections 6651 and 6653(a)(1) and (2), respectively. [1] Respondent, in an amendment to the answer, conceded the addition to tax for substantial understatement of tax under section 6661. *576 After concessions by respondent, the issues remaining for decision are: (1) Whether petitioner had taxable income of $ 170,863.47 [2] or some lesser amount in 1985; (2) whether petitioner is liable for additions to tax for fraud for 1985 under section 6653(b)(1) and (2) or, in the alternative, whether petitioner is liable for additions to tax for failure to file her 1985 income tax return and negligent or intentional disregard of the rules and regulations under sections 6651 and 6653(a)(1) and (2), respectively; and (3) whether petitioner is liable for additions to tax for failure to pay estimated income tax for 1985 under section 6654. For the reasons that follow, we hold that petitioner had taxable income of $ 151,618.67 and that she is liable for the additions *577 for fraud and failure to pay estimated tax. FINDINGS OF FACT Some of the facts have been stipulated, and except as otherwise noted, they are so found. The stipulation of facts, supplemental stipulations of facts, and attached exhibits are incorporated herein. Petitioner resided in Lone Star, Texas, when she filed her petition and amended petition in this case. In 1985, petitioner resided in Caddo Parish, Louisiana. Petitioner attended college for 2 years and her work experience, prior to 1985, includes employment as a bookkeeper for two financial institutions. In 1985, petitioner maintained a checking account and a money market account at the Commercial National Bank (CNB) in Shreveport, Louisiana, under the name Mrs. R. M. Forrest. [3] Petitioner and Chester Cox, her second husband, had joint signing authority on the checking account, and petitioner had sole signing authority on the money market account. *578 During 1985, petitioner deposited $ 161,862.99 and $ 38,249.11, respectively, into her CNB checking and money market accounts, and withdrew cash or wrote checks totaling $ 173,110.99 from the checking account. [4] Petitioner used the amounts deposited in these accounts to pay personal items and the personal debts of herself and members of her family. Petitioner also made gifts to family and friends using cash deposited in these accounts. Background
In summer 1983, petitioner and Mr. Cox began renting a house, on Cross Lake in Caddo Parish, Louisiana, from Sue Brown, the sister-in-law of Joe B. Hamiter, the former Chief Justice of the Louisiana Supreme Court (justice Hamiter). *579 During that summer, Mrs. Brown invited petitioner to a luncheon given by Justice Hamiter and introduced him to petitioner. Petitioner and Justice Hamiter subsequently became good friends. Justice Hamiter was not in good health when he met petitioner. Justice Hamiter had broken his hip in a 1972 accident at his home in Shreveport, Louisiana. The accident left Justice Hamiter permanently disabled, requiring him to use a walker or a wheelchair to get around. Justice Hamiter suffered from arteriosclerosis and Parkinson's disease, and also from severe depression, which had been precipitated by his accident and resulting loss of mobility, and aggravated by the 1981 deaths of his wife and brother. These illnesses prevented Justice Hamiter from writing, except to sign his name, and made it necessary for him to have round-the-clock nurse or sitter care. On January 1, 1984, petitioner began to work for Justice Hamiter as a sitter, attending to him when he visited her at the house on Cross Lake. Justice Hamiter paid petitioner $ 32 for each day she worked as a sitter. Petitioner, in addition to attending to Justice Hamiter on his trips to the house on Cross Lake, visited him at his *580 Shreveport house nearly every day that he did not go to Cross Lake. Although Justice Hamiter did not pay petitioner for visiting him at his Shreveport house, she used these frequent visits as occasions to take control of his life. In early 1984, during a visit to Justice Hamiter's house, petitioner ordered his housekeeper and other sitters to stop going to the mailbox, telling them that she would get his mail and open it for him. Petitioner took it upon herself to decide what medication Justice Hamiter was to receive and when he was to receive it, ordering changes in his medication without his physician's approval. Petitioner isolated Justice Hamiter from other members of his family by controlling the guest list to his Friday luncheons and limiting his visitors on other days. Petitioner even coerced Justice Hamiter to execute legal documents that harmed his relationships with family members and the Boy Scouts of America. In March 1984, petitioner directed Richard Schmidt, Justice Hamiter's attorney, to draft a document giving Mrs. Brown general power of attorney for Justice Hamiter. After Mr. Schmidt refused to deliver such a document for signature because it became clear to *581 him that Justice Hamiter did not want to sign the power of attorney, petitioner hired a second attorney, Perry Pringle, the nephew of Justice Hamiter's secretary, to draw up the document. In April 1984, Justice Hamiter, at the suggestion of petitioner, executed a power of attorney making Mrs. Brown his "true and lawful agent and attorney in fact". Petitioner also directed Mr. Pringle to prepare a new will for Justice Hamiter. Under this will, Mrs. Brown was to be the executrix of Justice Hamiter's estate, and property that under a prior will would have gone to his nieces, Julia Ann Hamiter Andress and Mary Elizabeth Hamiter Allen, was to go to Mrs. Brown. Mr. Pringle, at petitioner's direction, also removed the Hamiter Foundation, a charitable organization Justice Hamiter had founded for the benefit of the Norwela Council of the Boy Scouts of America, as Justice Hamiter's residuary legatee in favor of Mrs. Brown. Justice Hamiter signed this new will on May 31, 1984. On May 16, 1984, Mmes. Andress and Allen filed a petition for interdiction in the First Judicial District Court, Caddo Parish, Louisiana (Caddo Parish Court), alleging that petitioner was misappropriating Justice *582 Hamiter's estate or would do so in the near future. Mmes. Andress and Allen further alleged that petitioner was exerting undue influence on Justice Hamiter to take actions that he would not otherwise take. On June 8, 1984, the interdiction suit was dismissed following a settlement conference in which Justice Hamiter, speaking through petitioner, agreed not to write checks in excess of $ 350 without his accountant's signature. In January 1985, Justice Hamiter, at the suggestion of petitioner, revoked Mrs. Brown's power of attorney and executed a general power of attorney in favor of petitioner. Petitioner had told Mrs. Brown that Justice Hamiter wanted petitioner to have his power of attorney because she was helping him recover bonds that had been stolen in 1981 by the banks he had entrusted with them. [5] By April 1985, petitioner also had taken over from Mrs. Brown the responsibility of preparing all checks for Justice Hamiter's signature. *583 On May 24, 1985, Justice Hamiter signed a new will, prepared by Mr. Pringle at petitioner's direction. Under this will, petitioner was to be the executrix of Justice Hamiter's estate. Petitioner was also named residuary legatee, and property that formerly had been specifically devised and bequeathed to family members, including Mrs. Brown and Mmes. Andress and Allen, was to go to petitioner and Mr. Cox. Justice Hamiter died on January 7, 1986. On that same day, petitioner offered Justice Hamiter's will of May 25, 1985, for probate in the Caddo Parish Court, which thereupon appointed her temporary executrix. [6] In April 1986, Mmes. Andress and Allen petitioned the Caddo Parish Court to set aside Justice Hamiter's purported will of May 25, 1985. Mmes. Andress and Allen alleged that petitioner brought the full force of her influence, intimidation, control, domination and captation of * * * [Justice] Hamiter in getting him to execute a will prepared at her suggestion under the terms of which she was to be left the majority of his estate * * *.
In support of this allegation, Mmes. Andress and Allen also alleged that petitioner had "gained control and domination of the *584 entire life of * * * [Justice] Hamiter, including the food he ate, the people that he was allowed to visit, where he went, where he stayed, what time he went to bed, and how he spent his money." During a trial that lasted over 1 month, petitioner contested the petition and its allegations. Petitioner also argued that funds belonging to Justice Hamiter and deposited in her bank accounts from June 1984 through January 1986 were put there to avoid future interdiction attempts, were later repaid, or were gifts he had made to her. However, on March 24, 1987, the Caddo Parish Court filed its opinion nullifying the will on the ground that Justice Hamiter did not have the mental and emotional capacity to make an unconfused decision when he signed his May 25, 1985, will. The Caddo Parish Court noted, in its opinion, that the evidence showed that petitioner had controlled Justice Hamiter's actions and that the May 25, 1985, will had been prepared at her direction. On January 20, 1988, the Louisiana Court of Appeal for the Second Circuit affirmed the judgment of the Caddo Parish Court. Succession of Hamiter, 519 So. 2d 341 (La. Ct. App. 1988). *585 On June 16, 1989, the Caddo Parish Court held a hearing on the validity of Justice Hamiter's will dated May 31, 1984. On January 3, 1990, the Caddo Parish Court decided that "for many of the same reasons stated in the opinion of March 24, 1987 * * * it is the Court's conclusion, by clear and convincing evidence, that Justice Hamiter's third will, dated May 24, 1984 is also null and void." On January 23, 1991, the Louisiana Court of Appeal for the Second Circuit affirmed the judgment of the Caddo Parish Court. Succession of Hamiter, 573 So. 2d 584 (La. Ct. App. 1991). Justice Hamiter's "Gifts" to Petitioner
In June 1984, petitioner began to divert to her CNB bank accounts funds that properly belonged to Justice Hamiter. By yearend 1984, petitioner had deposited in her CNB accounts over $ 100,000 that belonged to Justice Hamiter. In 1985, the taxable year in issue, petitioner continued to divert to her CNB accounts funds belonging to Justice Hamiter. On January 23, 1985, petitioner deposited $ 11,000 into her CNB checking account. The source of these funds was a check from Tree Buyer's, Inc., payable to Justice Hamiter. Although Justice *586 Hamiter personally endorsed the check in blank, petitioner added her name and CNB checking account number. In March 1985, Justice Hamiter received a Federal income tax refund check payable to himself and his deceased wife in the amount of $ 13,173.29. Petitioner, after endorsing the check "Joe B. Hamiter and Hattie C. Hamiter (deceased) by Rosanne M. Forrest", deposited the check in her CNB money market account. On March 25, 1985, petitioner deposited, in her CNB checking account, an $ 8,300 check payable to her from Justice Hamiter. Mrs. Brown had prepared this check with the understanding that petitioner would use its proceeds to pay an income tax penalty that, according to petitioner, Justice Hamiter had purportedly incurred. Petitioner never paid any such penalty for Justice Hamiter. On October 18, 1985, petitioner deposited $ 38,680.27 into her checking account. The source of these funds was a certificate of deposit owned by Justice Hamiter and redeemed by petitioner. In December 1985, petitioner told Justice Hamiter, who was in the hospital at the time, that she was redeeming a certificate of deposit to pay his expenses during his hospital stay. On December 18, 1985, *587 petitioner cashed a $ 100,000 certificate of deposit owned by Justice Hamiter. Petitioner used the proceeds from the certificate to purchase a $ 75,000 certificate of deposit for Justice Hamiter and two money orders payable to Justice Hamiter in the respective amounts of $ 20,000 and $ 5,000. Although the record is unclear as to what happened to the $ 5,000 money order, on December 20, 1985, petitioner endorsed the $ 20,000 money order and deposited it in her CNB checking account. In February 1986, petitioner used $ 500 from this deposit to pay past due wages to Justice Hamiter's housekeeper. Petitioner did not spend any of the remaining $ 19,500 on Justice Hamiter's expenses. During 1985, petitioner deposited to her CNB accounts an additional $ 52,320.74 that belonged to Justice Hamiter. See Appendices I and II infra pp. 25-29. These deposits consisted of checks sent to Justice Hamiter by various financial institutions. Although the checks were payable to Justice Hamiter, petitioner took them from his mail without telling him of their receipt and endorsed and deposited them into her CNB accounts. On February 14, 1986, after Justice Hamiter's death, petitioner received *588 a $ 3,634.68 check from Lamar Life Insurance Co. Although this check was payable to Justice Hamiter, petitioner endorsed the check and deposited it into CNB checking account. Petitioner did not turn over the proceeds of this check to Justice Hamiter's estate. Other 1985 Deposits
During 1985, Justice Hamiter paid petitioner wages of $ 2,688, of which she deposited $ 1,216 in her CNB checking account. Justice Hamiter also reimbursed petitioner for groceries and miscellaneous expenditures she made on his behalf. Justice Hamiter made these payments by signing checks that petitioner or Mrs. Brown prepared. Petitioner or Mrs. Brown recorded, on each check stub, the total amount paid to petitioner and a summary of the reason for payment. Any funds that Justice Hamiter gave petitioner as reimbursement for groceries and miscellaneous expenditures were in addition to the wages he paid her. In 1985, petitioner received charge card cash advances of $ 12,800, which she deposited in her CNB checking account. Petitioner paid her charge card bills, including payments for the cash advances, using funds in her CNB checking account. During 1985, Mr. Cox received retirement pay from *589 the U.S. Air Force of $ 7,904.16. Petitioner endorsed Mr. Cox's retirement checks and deposited them in the CNB checking account. Mr. Cox also made repairs to the house that he and petitioner rented from Mrs. Brown. Mr. Cox was paid by Mrs. Brown when he made repairs to the house. In 1985, Mrs. Brown paid Mr. Cox $ 3,000.95 for such repairs. Petitioner deposited these funds in the CNB checking account. During 1985, petitioner received interest income from CNB of $ 1,475.82. CNB deposited these funds to petitioner's money market account. Petitioner did not file a 1985 Federal income tax return. However, petitioner and Mr. Cox did file joint income tax returns for 1981 through 1984, 1986 and 1987. Petitioner did not report, on her 1984 and 1986 income tax returns, any funds she misappropriated from Justice Hamiter during those years, which were properly includable in her taxable income. OPINION Respondent's Deficiency Determination
Respondent contends that petitioner had unreported taxable income of $ 170,863.47 in 1985, comprised of the following items. Respondent argues that, during 1985, Justice Hamiter paid petitioner wages of $ 1,208.24, [7] and that petitioner *590 unlawfully diverted an additional $ 144,474.30 from Justice Hamiter. Respondent also argues that petitioner's 1985 taxable income includes Mr. Cox's Air Force retirement pay of $ 7,904.16 and the $ 3,000.95 that Mr. Cox received from Mrs. Brown for work he did to the house he and petitioner were renting. Respondent further argues that petitioner's 1985 taxable income includes charge card advances of $ 12,800 and interest income of $ 1,475.82. *591 Petitioner contends that respondent erred in determining that she had unreported taxable income for 1985. Petitioner does not dispute that she received funds from Justice Hamiter. Rather, petitioner argues that these funds were to reimburse her for funds she spent on Justice Hamiter's 1985 living expenses or gifts that he made to her. Respondent's determination of petitioner's taxable income is presumptively correct, and petitioner bears the burden of proving it to be erroneous. Rule 142(a). Section 1 imposes a tax on the taxable income of every individual who is a citizen or resident of the United States. Sec. 1.1-1(a), Income Tax Regs. Every individual receiving gross income in excess of the exemption amount generally must make an income tax return and maintain books and records sufficient to establish gross income. Secs. 6001, 6012(a). If a taxpayer fails to file an income tax return and refuses to cooperate in the ascertainment of her income, the Commissioner may use any reasonable means to reconstruct the taxpayer's income, sec. 446, and, in reconstructing the taxpayer's income, the Commissioner is not required to establish "mathematical exactitude". Petzoldt v. Commissioner, 92 T.C. 661, 693-694 (1989); *592 see also DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The bank deposits method for computing income is a well-settled and court-approved method of reconstructing the taxpayer's income. DiLeo v. Commissioner, supra at 867; Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Under the bank deposits method, all money deposited in the taxpayer's bank account during the taxable year generally is assumed to be taxable income for that year. Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964); DiLeo v. Commissioner, supra at 868. The Commissioner, however, must take into account nontaxable items or deductible expenses of which she has knowledge. Price v. United States, supra at 677; Smith v. Commissioner, T.C. Memo. 1993-460. In the case at hand, respondent reconstructed petitioner's taxable income by reviewing all 1985 deposits *593 to and disbursements from petitioner's CNB checking and money market accounts. Respondent, where possible, linked each deposit to the activity that provided the source of funds. If respondent considered the source an income-producing activity, the deposit was included in taxable income. However, if respondent determined that the deposit came from nontaxable sources, the funds were excluded from petitioner's taxable income. [8]
Notwithstanding the above, respondent erroneously determined that petitioner's deposits of charge card advances were taxable income to her. Respondent also erroneously denied petitioner the benefits of Louisiana's community property law with respect to Mr. Cox's retirement income and amounts that Mrs. Brown paid Mr. Cox for *594 repairs he made to her rental house. [9]
Respondent argues that petitioner's charge card advances are taxable income to petitioner because she paid her charge card bills using funds misappropriated from Justice Hamiter. This argument confuses the charge card advances with the sources of the funds used to pay them off. Charge card advances are loan obligations and generally are not considered taxable income. See Flake v. Commissioner, T.C. Memo. 1984-647; see also United States v. Hogan, 886 F.2d 1497, 1509 (7th Cir. 1989). Petitioner incurred debt when she received the charge card advances. *595 That petitioner paid this debt using funds she misappropriated from Justice Hamiter did not make the debt less real. Inasmuch as the funds used to pay the cash advances likely were income to petitioner, in 1985 or some earlier year, petitioner did not gain or profit from the charge card advances, and including such advances in petitioner's income would amount to a double counting of income. Petitioner accordingly did not realize income when she obtained her charge card cash advances. See sec. 61. Section 66(b) provides that, with respect to any income, an individual taxpayer may be denied the benefits of any community property law where she acted as if she were solely entitled to such income and failed to notify her spouse of its nature and amount before the due date for filing the return. In the case at hand, respondent argues that petitioner acted as if she were solely entitled to Mr. Cox's income because she endorsed his retirement checks and deposited his income into the CNB checking account, an account that she controlled. Although petitioner endorsed Mr. Cox's retirement checks and deposited his income into the CNB checking account, Mr. Cox knew that Mrs. Brown was paying *596 him for the work he did for her and that he was receiving retirement pay from the Air Force. Mr. Cox had access to this income inasmuch as he had signing authority on the CNB checking account. [10] Petitioner's actions with respect to Mr. Cox's income were consistent with her role as manager of the family's finances. Under the circumstances, we do not believe that petitioner acted as if she were solely entitled to Mr. Cox's income. We therefore hold that, with respect to Mr. Cox's income, section 66(b) does not apply, and that petitioner is entitled to the benefits of Louisiana community property law. Accordingly, we hold that petitioner had unreported 1985 taxable income of $ 151,618.67, with a resulting deficiency in Federal income tax. See Appendices I and II infra pp. 25-29. Fraud Additions
*597 Section 6653(b)(1) and (2) provides for additions to tax equal to 50 percent of the entire underpayment of tax if any part of the underpayment is due to fraud and 50 percent of the interest payable with respect to the portion of the underpayment of tax attributable to fraud. For purposes of section 6653(b), fraud is an "intentional wrongdoing on the part of the taxpayer motivated by a specific purpose to evade a tax known or believed to be owing." Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); see also Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). Whether fraud exists is a factual question that we decide after reviewing the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992). Respondent bears the burden of proof on this issue, sec. 7454(a); Rule 142(b), and a finding of fraud will not automatically follow from petitioner's failure to prove the deficiency determination erroneous. *598 Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). Rather, respondent must establish, by clear and convincing evidence, that petitioner underpaid her 1985 Federal income tax and that some part of that underpayment is due to fraud. Sec. 7454(a); Rule 142(b). During 1985, Justice Hamiter paid petitioner wages. Petitioner unlawfully diverted funds to her CNB accounts that properly belonged to Justice Hamiter. Petitioner also was paid interest on the funds in her CNB money market account and certificates of deposits that she owned. Moreover, under Louisiana community property law, petitioner received a one-half interest in Mr. Cox's Air Force retirement income and the funds that Mrs. Brown paid Mr. Cox for repair work he performed. Although these substantial amounts were income to petitioner, she failed to file a 1985 income tax return and report them as such. Petitioner has not provided any evidence that she is entitled to any unclaimed deductions, credits, or exclusions. This is not the exceptional case in which unclaimed deductions are so likely as would make it appropriate to shift to respondent the burden of coming forward with evidence that *599 there were no such deductions. See and compare Rivera v. Commissioner, T.C. Memo. 1979-343 with Perez v. Commissioner, T.C. Memo. 1974-211. Respondent accordingly has shown through clear and convincing evidence that petitioner underpaid her 1985 income tax. Cf. Wheadon v. Commissioner, T.C. Memo. 1992-633. Section 6653(b)(1) also requires respondent to show that petitioner's underpayment of taxes was "due to fraud". This requires proof of specific intent of the taxpayer to evade a tax believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Webb v. Commissioner, supra; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). While fraudulent intent will not be imputed or presumed, Shaw v. Commissioner, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958), it may be proved by circumstantial evidence. Niedringhaus v. Commissioner, supra at 210; Rowlee v. Commissioner, supra at 1123; *600 see also Spies v. United States, 317 U.S. 492 (1943). Over the years, courts have relied on various kinds of circumstantial evidence to support a determination of fraudulent intent. These "badges of fraud" include: (1) A substantial understatement of income; (2) inadequate books and records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false Forms W-4; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity. Niedringhaus v. Commissioner, supra at 211; see also Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. These "badges of fraud" are nonexclusive. Niedringhaus v. Commissioner, supra at 211. Petitioner failed to file a return and report her income for 1985. Petitioner also substantially understated her income on the returns she filed for 1984 and 1986. While *601 consistent and substantial understatements of income, standing alone, do not establish fraud, they are strong evidence of fraudulent intent. Webb v. Commissioner, supra at 379 (quoting Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962)); see also McGee v. Commissioner, 519 F.2d 1121, 1125-1126 (5th Cir. 1975), affg. 61 T.C. 249 (1973). Respondent has established that petitioner's understatement of income was also due, in part, to her unauthorized misappropriations of funds that belonged to Justice Hamiter. Petitioner, in addition to misappropriating these funds, attempted to conceal her misconduct by making false statements to Justice Hamiter and Mrs. Brown regarding expenses she was paying on his behalf, failing to notify Justice Hamiter or his accountant when Justice Hamiter received income, and limiting access to Justice Hamiter and his financial records. When petitioner testified during the probate contests, she denied any misconduct, choosing to characterize the funds as "gifts" from Justice Hamiter. Petitioner's illegal conduct and her concealment *602 of the resulting income are additional indications that she intended to evade taxes. Cf. Bradford v. Commissioner, supra at 307; Wheadon v. Commissioner, T.C. Memo. 1992-633. Petitioner's failure to pay estimated tax and to file a 1985 income tax return are also signs of fraudulent intent. Inasmuch as petitioner filed income tax returns for 1984 and 1986, she was well aware of her obligation to file a 1985 income tax return. That petitioner therefore would fail to pay estimated tax and to file an income tax return only for a year in which she was misappropriating funds belonging to Justice Hamiter is highly convincing evidence of fraud. See Solomon v. Commissioner, T.C. Memo. 1982-603, affd. 732 F.2d 1459 (6th Cir. 1984). Accordingly, the record in this case contains sufficient indications of fraudulent intent. It also is clear that the entire underpayment of tax was due to fraud. We therefore hold petitioner liable for the fraud additions to tax under section 6653(b)(1) and (2). Inasmuch as petitioner is liable for the additions to tax for fraud, she *603 is not liable for the additions to tax for failure to file her 1985 income tax return and negligent or intentional disregard of the rules and regulations under sections 6651 and 6653(a)(1) and (2), respectively. Sec. 6653(b)(3), (d). Failure To Pay Estimated Income Tax Additions
Section 6654(a) provides for an addition to tax in the case of any underpayment of estimated tax by an individual. The amount of the addition to tax for failure to pay estimated income tax is determined by applying the underpayment rate established under section 6621 to the underpayment amount for the period of underpayment. Sec. 6654(a). For purposes of section 6654(a), the amount of underpayment is the excess of the required installment amount [11] over the installment amount paid on or before its due date, and the period of underpayment runs from the installment due date to the earlier of (1) the 15th day of the 4th month following the close of the taxable year or (2) with respect to any portion of the underpayment, the date on which such portion is paid. Sec. 6654(b). *604 Section 6654 provides no exception for reasonable cause or lack of willful neglect. The addition to tax under section 6654(a) is mandatory unless the taxpayer shows that one of several exceptions specifically provided under section 6654(d) applies. Niedringhaus v. Commissioner, 99 T.C. at 222; Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioner had substantial taxable income for 1985. Petitioner nevertheless did not file a Federal income tax return for 1985 or make estimated tax payments for that year. Petitioner has not shown that any of the statutory exceptions apply to her case. We therefore sustain respondent's determination and hold petitioner liable for an addition to tax for failure to pay estimated income tax, reduced to reflect respondent's concessions and our reductions in respondent's adjustments to petitioner's taxable income. To reflect the foregoing and concessions by respondent, Decision will be entered under Rule 155. Appendix I Rosanne Forrest Cox Commercial National Bank: Checking Account # XXX4984
Summary of 1985 Deposits Bank
Posting
Deposits
Description Per
Date
Amounts
Check Payee
Source Document
04-Jan-85
$ 658.68
Chester Cox
Air Force retirement pay
04-Jan-85
50.85
Rosanne Cox
14-Jan-85
150.95
Rosanne Cox
Sitter wages
Reimbursement of expenses
14-Jan-85
138.41
Rosanne Cox
Sitter wages
Reimbursement of expenses
14-Jan-85
942.33
J. Hamiter/
First National Bank
S. Brown
18-Jan-85
50.00
Rosanne Cox
Reimbursement of expenses
18-Jan-85
89.00
Rosanne Cox
Sitter wages
Reimbursement of expenses
23-Jan-85
11,000.00
Justice Hamiter
Tree Buyers
29-Jan-85
94.32
Rosanne Cox
Sitter wages
Reimbursement of expenses
29-Jan-85
658.68
Chester Cox
Air Force retirement pay
05-Feb-85
130.60
Justice Hamiter
Sitter wages
Reimbursement of expenses
11-Feb-85
579.62
Rosanne Cox
S. Brown -- reimbursement of
expenses (chairs)
28-Feb-85
975.85
Justice Hamiter
First National Bank
28-Feb-85
99.74
Rosanne Cox
Sitter wages
Reimbursement of expenses
28-Feb-85
658.68
Chester Cox
Air Force retirement pay
05-Mar-85
178.71
Rosanne Cox
Sitter wages
Reimbursement of expenses
05-Mar-85
108.88
Rosanne Cox
Reimbursement of expenses
(drapes)
05-Mar-85
12,321.37
Justice Hamiter
PM Life Insurance
11-Mar-85
300.95
Rosanne Cox
S. Brown -- cabin repairs
11-Mar-85
116.76
Rosanne Cox
Sitter wages
Reimbursement of expenses
20-Mar-85
800.00
Credit card advance
20-Mar-85
1,000.00
Rosanne Cox
Credit card advance
20-Mar-85
600.00
Credit card advance
20-Mar-85
600.00
Credit card advance
20-Mar-85
500.00
Credit card advance
25-Mar-85
8,300.00
Rosanne Cox
S. Brown -- income tax
refund
25-Mar-85
2,000.00
01-Apr-85
658.68
Chester Cox
Air Force retirement pay
01-Apr-85
131.19
Justice Hamiter
New York Life
01-Apr-85
11.97
Rosanne Cox
American Family
Publisher refund
01-Apr-85
126.34
Rosanne Cox
Sitter wages
Reimbursement of expenses
01-Apr-85
19.69
Rosanne Cox
Fingerhut
12-Apr-85
131.24
Rosanne Cox
Sitter wages
Reimbursement of expenses
19-Apr-85
2,700.00
Rosanne Cox
S. Brown -- cabin repairs
30-Apr-85
658.68
Chester Cox
Air Force retirement pay
06-May-85
2,000.00
Transfer from money
market account
06-May-85
273.62
Rosanne Cox
Sears
06-May-85
98.76
Rosanne Cox
Sitter wages
Reimbursement of expenses
06-May-85
1,000.00
Credit card advance
13-May-85
276.06
Rosanne Cox
S. Brown -- reimbursement of
expenses
13-May-85
25.00
Rosanne Cox
M. Giordano
13-May-85
120.14
Rosanne Cox
Sitter wages
Reimbursement of expenses
17-May-85
162.95
Rosanne Cox
Sitter wages
Reimbursement of expenses
17-May-85
400.00
Credit card advance
30-May-85
3,000.00
Rosanne Cox
Transfer from money
market account
03-Jun-85
123.03
Rosanne Cox
Sitter wages
Reimbursement of expenses
03-Jun-85
134.16
Rosanne Cox
Sitter wages
Reimbursement of expenses
03-Jun-85
600.00
Credit Card advance
03-Jun-85
658.68
Chester Cox
Air Force retirement pay
06-Jun-85
500.00
Credit Card advance
06-Jun-85
300.00
Credit Card advance
06-Jun-85
395.88
Rosanne Cox
S. Brown -- reimbursement
of expenses (rugs)
10-Jun-85
5,000.00
Transfer from money
market account
14-Jun-85
600.00
Credit Card advance
14-Jun-85
109.17
Rosanne Cox
Sitter wages
Reimbursement of expenses
14-Jun-85
106.23
Rosanne Cox
Sitter wages
Reimbursement of expenses
03-Jul-85
10.00
Rosanne Cox
V. Nichols
03-Jul-85
658.68
Chester Cox
Air Force retirement pay
05-Jul-85
148.59
Rosanne Cox
Sitter wages
Reimbursement of expenses
10-Jul-85
1,200.00
Rosanne Cox
Transfer
16-Jul-85
2,200.00
16-Jul-85
500.00
Credit card advance
16-Jul-85
300.00
Credit card advance
16-Jul-85
500.00
Credit card advance
16-Jul-85
5,000.00
Transfer from money
market account
18-Jul-85
150.83
Rosanne Cox
Sitter wages
Reimbursement of expenses
30-Jul-85
2,000.00
Credit card advance
01-Aug-85
658.68
Chester Cox
Air Force retirement pay
07-Aug-85
110.63
Rosanne Cox
Sitter wages
Reimbursement of expenses
09-Aug-85
157.28
Rosanne Cox
Sitter wages
Reimbursement of expenses
09-Aug-85
30.00
Rosanne Cox
Robert Forrest
12-Aug-85
246.20
Rosanne Cox
Sue Brown
15-Aug-85
300.00
Credit card advance
15-Aug-85
600.00
Credit card advance
15-Aug-85
4,500.00
Transfer from money
market account
15-Aug-85
500.00
Credit card advance
23-Aug-85
137.71
Rosanne Cox
Sitter wages
Reimbursement of expenses
23-Aug-85
2,000.00
30-Aug-85
658.68
Chester Cox
Air Force retirement pay
10-Sep-85
400.00
Credit card advance
10-Sep-85
500.00
Rosanne Cox
Transfer from money
market account
12-Sep-85
10,000.00
Justice Hamiter
First National Bank
01-Oct-85
658.68
Chester Cox
Air Force retirement pay
14-Oct-85
1,750.00
18-Oct-85
38,680.27
Justice Hamiter
Cash from Hamiter CD
30-Oct-85
260.00
Rosanne Cox
05-Nov-85
217.80
Rosanne Cox
Sitter wages
Reimbursement of expenses
05-Nov-85
350.00
Rosanne Cox
05-Nov-85
190.42
Rosanne Cox
Reimbursement of expenses
05-Nov-85
658.68
Chester Cox
Air Force retirement pay
29-Nov-85
658.68
Chester Cox
Air Force retirement pay
29-Nov-85
299.71
Robert Forrest
LA Downs
05-Dec-85
300.00
Credit card advance
05-Dec-85
300.00
Credit card advance
05-Dec-85
40.00
Rosanne Cox
M. Shaw
10-Dec-85
127.20
Rosanne Cox
Sitter wages
Reimbursement of expenses
17-Dec-85
100.00
Rosanne Cox
M. Giordano
17-Dec-85
178.42
Rosanne Cox
Sitter wages
Reimbursement of expenses
17-Dec-85
200.00
Credit Card advance
20-Dec-85
20,000.00
Justice Hamiter
Cash from Hamiter CD
161,862.99
*605 Deposit Taxable Nontaxable
Amounts Amount
Amount
$   658.68
$   329.34
$   329.34
50.85
50.85
150.95
64.00
86.95
138.41
64.00
74.41
942.33
942.33
50.00
50.00
89.00
32.00
57.00
11,000.00
11,000.00
94.32
32.00
62.32
658.68
329.34
329.34
130.60
32.00
98.60
579.62
975.85
975.85
99.74
32.00
67.74
658.68
329.34
329.34
178.71
32.00
146.71
108.88
108.88
12,321.37
12,321.37
300.95
150.47
150.48
116.76
32.00
84.76
800.00
800.00
1,000.00
1,000.00
600.00
600.00
600.00
600.00
500.00
500.00
8,300.00
8,300.00
2,000.00
2,000.00
658.68
329.34
329.34
131.19
131.19
11.97
11.97
126.34
64.00
62.34
19.69
19.69
131.24
64.00
67.24
2,700.00
1,350.00
1,350.00
658.68
329.34
329.34
2,000.00
2,000.00
273.62
273.62
98.76
32.00
66.76
1,000.00
1,000.00
276.06
276.06
25.00
25.00
120.14
64.00
56.14
162.95
64.00
98.95
400.00
400.00
3,000.00
3,000.00
123.03
32.00
91.03
134.16
32.00
102.16
600.00
600.00
658.68
329.34
329.34
500.00
500.00
300.00
300.00
395.88
395.88
5,000.00
5,000.00
600.00
600.00
109.17
32.00
77.17
106.23
32.00
74.23
10.00
10.00
658.68
329.34
329.34
148.59
64.00
84.59
1,200.00
1,200.00
2,200.00
2,200.00
500.00
500.00
300.00
300.00
500.00
500.00
5,000.00
5,000.00
150.83
64.00
86.83
2,000.00
2,000.00
658.68
329.34
329.34
110.63
32.00
78.63
157.28
64.00
93.28
30.00
30.00
246.20
246.20
300.00
300.00
600.00
600.00
4,500.00
4,500.00
500.00
500.00
137.71
64.00
73.71
2,000.00
2,000.00
658.68
329.34
329.34
400.00
400.00
500.00
500.00
10,000.00
10,000.00
658.68
329.34
329.34
1,750.00
1,750.00
38,680.27
38,680.27
260.00
260.00
217.80
64.00
153.80
350.00
350.00
190.42
190.42
658.68
329.34
329.34
658.68
329.34
329.34
299.71
299.71
300.00
300.00
300.00
300.00
40.00
40.00
127.20
64.00
63.20
100.00
100.00
178.42
64.00
114.42
200.00
200.00
20,000.00
20,000.00
161,862.99
116,969.56
44,893.43
*606 Appendix II Rosanne Forrest Cox Commercial National Bank: Money Market Account # XXX1981
Summary of 1985 Deposits Bank
Posting
Deposit
Description Per
Date
Amount
Check Payee
Source Document
16-Jan-85
$ 71.24
Interest on CD
25-Jan-85
128.96
Interest
28-Jan-85
300.00
Transfer from checking
26-Feb-85
300.00
Transfer from checking
27-Feb-85
78.16
Interest
18-Feb-85
71.34
Interest on CD
18-Mar-85
64.44
Interest on CD
21-Mar-85
13,173.29
Hattie &
Tax refund
J. Hamiter
27-Mar-85
63.97
Interest
27-Mar-85
300.00
Transfer from checking
16-Apr-85
71.34
Interest on CD
24-Apr-85
300.00
Transfer from checking
26-Apr-85
127.93
Interest
16-May-85
69.04
Interest on CD
24-May-85
65.48
Interest
24-May-85
300.00
Transfer from checking
25-Jun-85
20,000.00
Rosanne Forrest
Cash from J. Hamiter
27-Jun-85
71.35
Interest on CD
27-Jun-85
82.95
Interest
25-Jun-85
300.00
Transfer from checking
16-Jul-85
69.04
Interest on CD
26-Jul-85
300.00
Transfer from checking
26-Jul-85
61.92
Interest
16-Aug-85
71.34
Interest on CD
26-Aug-85
300.00
Transfer from checking
27-Aug-85
26.55
Interest
16-Sep-85
71.34
Interest on CD
26-Sep-85
300.00
Transfer from checking
16-Oct-85
69.04
Interest on CD
25-Oct-85
300.00
Transfer from checking
18-Nov-85
71.35
Interest on CD
27-Nov-85
300.00
Transfer from checking
16-Dec-85
69.04
Interest on CD
27-Dec-85
300.00
Transfer from checking
38,249.11
*607 Deposit Taxable Nontaxable
Amount
Amount
Amount
$   71.24
$   71.24
128.96
128.96
300.00
$   300.00
300.00
300.00
78.16
78.16
71.34
71.34
64.44
64.44
13,173.29
13,173.29
63.97
63.97
300.00
300.00
71.34
71.34
300.00
300.00
127.93
127.93
69.04
69.04
65.48
65.48
300.00
300.00
20,000.00
20,000.00
71.35
71.35
82.95
82.95
300.00
300.00
69.04
69.04
300.00
300.00
61.92
61.92
71.34
71.34
300.00
300.00
26.55
26.55
71.34
71.34
300.00
300.00
69.04
69.04
300.00
300.00
71.35
71.35
300.00
300.00
69.04
69.04
300.00
300.00
38,249.11
34,649.11
3,600.00
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1985. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In the statutory notice of deficiency, respondent determined that petitioner had $ 208,241 of unreported taxable income for 1985. However, on brief, respondent conceded that petitioner's unreported taxable income for 1985 was no more than $ 170,863.47.↩
3. In 1972, petitioner divorced her first husband, Robert Forrest. Soon thereafter she married Chester Cox. Petitioner nevertheless sometimes uses the last name Forrest.↩
4. The parties' stipulations provide that, during 1985, petitioner deposited $ 174,991.91 and $ 33,249.11, respectively, in her CNB checking and money market accounts. However, the evidence presented at trial, respondent's summaries of petitioner's 1985 deposits, reflects total deposits of $ 161,862.99 and $ 38,249.11 to these CNB accounts.↩
5. The bonds actually had been cashed and the proceeds deposited in Justice Hamiter's bank account.↩
6. On Jan. 8, 1986, Mrs. Andress petitioned the Caddo Parish Court to remove petitioner as temporary executrix of Justice Hamiter's estate. Mrs. Andress argued that petitioner was not competent to serve as temporary executrix because she was previously convicted in Arkansas of issuing bad checks, a felony in Arkansas. The Caddo Parish Court thereupon suspended its previous day's order appointing petitioner temporary executrix of Justice Hamiter's estate.↩
7. Justice Hamiter's check stubs show that during 1985 he paid petitioner $ 2,688 in wages, of which petitioner deposited $ 1,216 in her CNB checking account. Respondent nevertheless argues, on brief, that petitioner is liable for tax on wages paid by Justice Hamiter in the amount of $ 1,208.24. We therefore deem respondent to have conceded the difference. See e.g., Burbage v. Commissioner, 82 T.C. 546, 547 n.2 (1984), affd. 744 F.2d 644 (4th Cir. 1985); Wolf v. Commissioner, T.C. Memo. 1992-432↩.
8. Petitioner, despite the Court's urging, did not testify or offer any evidence to refute respondent's determinations. Petitioner instead chose to try to refute respondent's determinations by interrupting the testimony of respondent's witnesses with her own arguments.↩
9. A spouse residing in a community property State, such as Louisiana, has a vested interest in one-half of the marital community's income and generally is liable for Federal income tax on that interest. United States v. Mitchell, 403 U.S. 190, 197 (1971); Hilton v. Commissioner, T.C. Memo. 1990-379↩.
10. If petitioner had wanted to act as if only she were entitled to Mr. Cox's income, it is likely that she would have made the deposits to her CNB money market account, for which she had sole signing authority.↩
11. Sec. 6654(d)(1) provides, in pertinent part, that In(A) General. -- Except as provided in paragraph (2), the amount of any required installment shall be 25 percent of the required annual payment. (B) Required Annual Payment. -- For purposes of subparagraph (A), the term "required annual payment" means the lesser of -- (i) 80 percent of the tax shown on the return for the taxable year (or, if no return is filed, 80 percent of the tax for such year), or (ii) 100 percent of the tax shown on the return of the individual for the preceding taxable year. Clause (ii) shall not apply if the preceding taxable year was not a taxable year of 12 months or if the individual did not file a return for such preceding taxable year.↩